IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| BORINQUEN BISCUIT CORP., | CIVIL NO: 04-2070 (PG) |
| Plaintiff, | |
| v. | TRADEMARK INFRINGEMENT; UNFAIR COMPETITION; DILUTION AND REQUEST FOR INJUNCTIVE RELIEF |
| M.V. TRADING CORP,, ABC INSURANCE CO., | |
| Defendant. | |

## OPPOSITION TO "MOTION REQUESTING PRELIMINARY INJUNCTION"

NOW COMES M.V. Trading Corp. ("MV"), through its undersigned attorneys, and very respectfully state and pray:

On October 8, 2004, plaintiff Borinquen Biscuit Corp. ("Borinquen") filed a "Motion Requesting Preliminary Injunction," which M.V. Trading hereby opposes.

A party seeking a preliminary injunction must establish that 1) it is substantially likely to succeed on the merits of its claim; 2) absent the injunction there is "a significant risk of irreparable harm"; 3) the balance of hardships weighs in its favor; and 4) the injunction will not harm the public interest. I.P. Lund Trading v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998); Coco Rico v. Fuertes Pasarell, 738 F.Supp. 613 (D.P.R. 1990).  The most important factor in this analysis is the likelihood of success on the merits of the claim.  In order to show a likelihood of success,

plaintiff must show a "likelihood of confusion" between the two marks by the relevant consuming public.  Section 32(1) of the Lanham Act, 15 U.S.C. § 114(1); <u>Boston Athletic Ass'n v. Sullivan</u>, 867 F.2d 22, 28 (1st Cir. 1989).  "Trademark law seeks to prevent one seller from using the same 'mark' as--or one similar to--that used by another in such a way that he confuses the public about who really produced the goods (or service)." <u>De Costa v. Viacom Int'l, Inc.</u>, 981 F.2d 602, 605 (1st Cir. 1992); <u>WCVB-TV v. Boston Athletic Ass'n</u>, 926 F.2d 42, 43 (1st Cir. 1991).  The law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.  See <u>McLean v. Fleming</u>, 96 U.S. 245, 251 (1877); <u>Coca-Cola Co. v. Snow Crest Beverages, Inc.</u>, 162 F.2d 280, 284 (1st Cir. 1947).  "This means, of course, that confusion resulting from the consuming public's carelessness, indifference, or ennui will not suffice." <u>International Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing</u>, 103 F.3d 196 (1st Cir. 1996), <u>citing</u> <u>United States v. 88 Cases, More or Less, Containing Bireley's Orange Beverage</u>, 187 F.2d 967, 971 (3d Cir. 1951)(inferring that "the legislature contemplated the reaction of the ordinary person who is neither savant nor dolt, [and] who . . . exercises a normal measure of the layman's common sense and judgment"); <u>see also Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd.</u>, 34 F.3d 410, 414

(7th Cir. 1994) (explaining that the Lanham Act does not "protect the most gullible fringe of the consuming public").

In achieving those purposes, trademark law generally seeks to prevent one seller from using a "mark" identical or similar to that used by another seller in a way that confuses the public about the actual source of the goods or services in question. <u>Star Fin. Services, Inc. v. AASTAR Mortgage Corp.</u>, 89 F.3d 5, 9 (1st Cir. 1996). Such confusion may prevent the buyer from obtaining the goods he seeks or may endanger the reputation of the first user of the mark by association with the subsequent user. <u>DeCosta v. Viacom Int'l, Inc.</u>, 981 F.2d 602, 605 (1st Cir. 1992).

The First Circuit has identified eight factors to be considered in determining likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade;  (4) the relationship between the parties advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of plaintiff's mark. <u>Astra Pharmaceutical Prod. v. Beckman Instruments</u>, 718 F.2d 1201 (1st Cir. 1983); <u>Pignons S.A. de Mecanique v. Polaroid Corp.</u>, 657 F.2d 482 (1st Cir. 1981).  We will apply each of those factors to this case.

**(1) <u>The similarity of the marks</u>**.

As plaintiff correctly states, similarity is determined on the

basis of the total effect of the designation, rather than a comparison of individual features. The only thing that the two marks in this case have in common is that Borinquen uses the word RICA and MV uses the word Ricas as part of their marks. The similarity ends there. Borinquen's mark, "GALLETAS RICA SUNLAND," is clearly distinguishable from MV's mark, "Nestlé Ricas." The name of Nestlé is prominently displayed on top of the name Ricas, while "Sunland" is clearly displayed under the name RICA in Boriquen's mark. "GALLETAS RICA SUNLAND" is written in white letters in a red circular background with a white lining. The word "Ricas" in Nestlé's package is written in red letters on a white oval background with a blue lining. "Nestlé Ricas" and "GALLETAS RICA SUNLAND" are written in wholly different fonts. "GALLETAS RICA SUNLAND" is written in capital letters, while "Nestlé Ricas" is not.

Borinquen states that "the colors of the letters used for the mark is identical." This is false. The word Ricas in Nestlé's mark is written in red letters, while the word RICA in Borinquen's mark is written in white letters. Also, contrary to Borinquen's assertion, the different reds used in the different boxes, while similar, are not identical. See Exhibits C and E of the Complaint. Additionally, many other brands of cookies and crackers have red packages. See Exhibit 1, which are samples of placements of cookies and crackers. Also, the two boxes are very different.

MV's package is taller, less deep and less wide than Borinquen's package.  The top and bottom of Borinquen's package shows the Royal Borinquen mark, while the top and bottom of MV's box prominently displays the Nestlé brand.  In fact, the Nestlé brand is displayed in all six sides of the Nestlé Ricas box, always in conjunction with the word Ricas.  All six sides of Borinquen's package show the terms GALLETAS RICA SUNLAND.  Nestlé is a world famous mark.  Thus, all reasonable consumers can readily see that the source of Nestlé Ricas is Nestlé.  No reasonable consumer can think that the source is Royal Borinquen or Borinquen Biscuit.

The trade dresses that appear in the boxes are also totally different.  GALLETAS RICA SUNLAND's box shows superimposed "María-type" cookies, a circle with "GALLETAS RICA SUNLAND" in the middle, part of an individual packet on the bottom right hand corner and, in a triangle on the top right hand corner, the legend "New! 8 FLAVOR FRESH PACKS."  The back of "GALLETAS RICA SUNLAND" box is identical to its front.  On the other hand, MV's "Nestlé Ricas" box shows scattered Ritz-type crackers, with the legend "GALLETAS FINAS SALADAS" inside a white slanted oval with a blue border.  Prominently displayed on part of the inside of the oval is a superimposed red background with the famous mark and design of Nestlé.  In red letters, below the Nestlé brand, appears the name "Ricas."  A blue number four and a yellow banner with the word "paquetes" appears on the bottom left corner.

The back of Nestlé Ricas box is totally different from the front.
It displays whole crackers and crackers that have been partly
consumed.  All of them have different types of dressings on top.
The back of the box also has a white rectangle on the bottom right
hand corner that displays the Nestlé brand, and identifies Nestlé's
website, for customer service.  Also, on one of its sides, the box
identifies two Nestlé affiliates as importers of Nestlé Ricas:
Nestlé de Colombia, S.A and Nestlé Venezuela, S.A.  On another
side, the box identifies the manufacturer of the product as
"Industrial Surindu, S.A., Guayaquil, Industria Ecuatoriana."
Borinquen's box, on the other hand, on one of its sides, states
that the product is made in USA by Borinquen Biscuit Corporation in
Yauco, Puerto Rico, and identifies its website as
**www.galletasroyalborinquen.com**.

Trade dress has been defined as "the design and appearance of [a]
product together with the elements making up the overall image that
serves to identify the product presented to the consumer." Fun-
Damental Too, Ltd. v. Gemmy Indus., 111 F.3d 993, 999 (2d Cir.
1997) (internal citation omitted); see also Keebler Company v.
Rovira Biscuit, 624 F.2d 366 (1st Cir. 1980) ("The elapsed time
between Rovira's first use and the trial, and the substantial
difference between the two containers leads us to conclude that it
was clearly erroneous for the district court to find that Rovira's
trade dress "gives rise to consumer confusion" without some

evidence in the record to support this finding.")(emphasis added); See also DeCosta v. CBS, Inc., 520 F.2d at 514-15, n.10

In order to warrant protection, trade dress must be either inherently distinctive or have become so by acquiring a secondary meaning. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769. Inherently distinctive trade dress cannot be functional, and to prevail on a claim of infringement, the defendant's product must have created a likelihood of confusion with regard to its source. Chrysler Corporation v. John C. Silva, 118 F.3d 56 (1st Cir. 1997); Tec Eng'q Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir. 1996). In Yankee Candle Company, Inc. v. Bridgewater Candle Company, 259 F.3d 25, 42 (1st Cir. 2001), the First Circuit cited with approval the following factors to determine inherent distinctiveness: "(i) whether the design was a common or basic one; (ii) whether it was "unique or unusual" in the field; (iii) whether it was a refinement of a common form of ornamentation; and (iv) "whether it was capable of creating a commercial impression distinct from the accompanying words." (quoting Seabrook Foods, Inc. v. Bar-Well Foods Ltd., 568 F.2d 1342, 1344 (C.C.P.A. 1977). "In reality [the question is] whether the [dress] is so unique, unusual or unexpected in this market that it will automatically be perceived by customers as an indicator of origin." Id. Finally, "in the absence of any evidence that the claimed trade dress actually does identify a product's source, the trade dress should

not be entitled to protection." <u>Id</u>.

Borinquen's trade dress is not inherently distinctive nor has Borinquen provided any evidence that it has acquired secondary meaning.  Borinquen's trade dress is very common in the industry, in not unique or unusual.  It is certainly not so unique or unexpected so as to be automatically perceived by customers as an indicator of origin.  But in any event, we have shown that MV's trade dress is very different from Borinquen's trade dress, so there can be no infringement.

Also "in certain circumstances otherwise similar marks are not likely to be confused if they are used in conjunction with clearly displayed names, logos or other source-identifying designations of the manufacturer." <u>Id.</u>, citing <u>Aktiebolaget Electrolux v. Armatron Int'l, Inc.</u>, 999 F.2d 1, 4 (1st Cir. 1993)(The Leaf Eater mark is similar to the Weed Eater mark, but the similarity was diluted by the frequent use of appellant's logos Vornado and Flowtron); <u>Pignons</u>, 657 F.2d at 487.  The First Circuit has consistently found that "otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." <u>Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.</u>, 718 F.2d 1201, 1205 (1st Cir. 1983), <u>citing Pignons</u>, 657 F.2d at 487; <u>Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.</u>, 626 F.2d 193, 194-95 (1st Cir. 1980); <u>Yankee Candle Company, Inc. v. Bridgewater Candle Company</u>, 259 F.3d 25, 45 (1st

Cir. 2001)("The fact that Bridgewater candles prominently display the Bridgewater trade name makes this lack of evidence [of confusion] unsurprising").  The strength of the Nestlé mark, which is prominently displayed together with the word Ricas on all six sides of the package, preclude any possibility of confusion with GALLETAS RICA SUNLAND.  See also, <u>Worthington Foods, Inc. v. Kellogg Co.</u>, 732 F. Supp. 1417 (S.D. Ohio 1990)  (Since a house mark is part of the mark as a whole, it must be considered in judging overall similarity. "[T]he display of a company's own familiar mark on a product reduces the likelihood of confusion which might stem from the simultaneous use of another's mark."); <u>Pristine Industries, Inc. v. Hallmark  Cards, Inc.</u>, 753 F. Supp. 140 (S.D.N.Y. 1990)(use of  defendant's own well-known house mark [HALLMARK for greeting  cards] in connection with the disputed mark is a strong factor pointing to no likely confusion; preliminary injunction was denied); <u>Four Seasons Hotels, Ltd. v.  Koury Corp.</u>, 776 F. Supp. 240 (E.D.N.C. 1991) (use of  plaintiff's FOUR SEASONS mark for defendant's hotel in connection with the house mark of a national hotel franchisor, such as Best Western, Hyatt or Radisson, will not cause confusion); <u>W.W.W. Pharmaceutical Co. v. Gillette Co.</u>, 808 F. Supp. 1013 (S.D.N.Y. 1992)(RIGHT GUARD SPORT STICK deodorant does not infringe SPORTSTICK lip balm: "Where a similar mark is used in conjunction with a company name, the likelihood of confusion is lessened."); <u>In re Merchandising Motivation, Inc.</u>, 184

U.S.P.Q. 364 (T.T.A.B. 1974) (MMI MENSWEAR is not confusingly similar to MEN'S WEAR where MEN'S WEAR is descriptive, if not generic); In re Champion International Corp., 196 U.S.P.Q. 48 (T.T.A.B. 1977)(rule restated and applied to where cited mark contains house mark and applicant's mark comprises merely the product mark); In re Avnet, Inc., 195 U.S.P.Q. 185 (T.T.A.B. 1977)(no confusion likely between CHANNEL-MASTER CHROMA-KING and COLOR KING); General Mills, Inc. v. Kellogg  Co.,  824 F.2d 622 (8th Cir. 1987)(where plaintiff's mark  is relatively weak and both parties also use their widely recognized house marks in a prominent manner, no likelihood of confusion will be found); MarCon, Ltd. v. Avon Products, Inc., (T.T.A.B. 1987)(no likelihood of confusion in SILK cosmetics vs. AVON SILKEN SOAP liquid soap; addition of house mark is sufficient to differentiate the marks).

In Posadas de P.R. Assocs., Inc. v. Sands Hotel & Casino, Inc., 131 D.P.R. 21 (1992), both parties were hotels who used their respective marks to market exclusive luxury-class hotel services. Plaintiff was the first one to use its mark.  The issue was whether defendant's (Sands Hotel & Casino) use of the mark "Sands Plaza Club" created a probability of confusion with plaintiff's (who operated the Hotel Condado Plaza) "Plaza Club" mark and, thereby, infringed upon plaintiff's mark. The lower court determined that there was a probability of confusion between "Plaza Club" and "Sand's Plaza Club."  The Supreme Court of Puerto Rico disagreed

and reversed. Based on an evaluation of the pertinent factors, including the strength of plaintiff's mark, similarities between them, the combination with the hotel's mark, and the context in which the marks where used in commerce, the Court determined there was no probability of confusion.   Similarly, in <u>Coco Rico v. Fuertes Pasarell</u>, 738 F. Supp. 613 (D.P.R. 1990), this Court concluded that "Coco Rico" was not likely to be confused with "Coco Frío." While both products were carbonated coconut-flavored soft drinks, the formulas used in the two drinks were different, and therefore, the taste of each product was distinctive.

Therefore, for the reasons discussed above, the two marks in question in this case are not similar.

**(2) <u>The similarity of the goods.</u>**

The goods are different and do not compete.   "GALLETAS RICA SUNLAND" are sweet cookies, while Nestlé Ricas are saltine crackers.   No one would eat "GALLETAS RICA SUNLAND" with ham and cheese, just as no one would dip Nestlé Ricas in milk. This is readily apparent from the packaging.   Nestlé Ricas expressly state in their box that they are "GALLETAS FINAS SALADAS" ("Fine Saltine Crackers").   "GALLETAS RICA SUNLAND" box shows cookies that are almost identical to the famous María cookies.   The Nestlé Ricas that are displayed in its box are very similar to Ritz crackers and directly compete with them.   The back side of the Nestlé RICA box also shows that they are akin to Ritz crackers.   They are displayed

with different types of dressings that are typically added to saltine crackers.

GALLETAS RICA SUNLAND and Nestlé Ricas are simply different goods. The consumer that wants a cookie will buy a cookie.  The consumer who wants a cracker will buy a cracker. No reasonable consumer would buy Nestlé Ricas thinking that they are GALLETAS RICA SUNLAND.  Finally, Borinquen claims that since 1962 it has sold cookie products using the name RICA, but has proffered absolutely no evidence for such assertion.

**(3)** **The relationship between the parties' channels of trade**.

Both MV and Borinquen distribute their product in supermarkets. However, "GALLETAS RICA SUNLAND" are placed with the cookies and Nestlé Ricas are placed with the crackers.  See sample of store placement attached as Exhibit 1.  A leading commentator has stated that the fact that both "plaintiff's and defendant's goods are sold nearby in the same store tends to increase the likelihood that buyers will think the goods come from the same source, even though they are not competitive products.  This test has been particularly persuasive when both products are food products usually sold in the same food market.  However, there is no such thing as an "under the same roof" rule.  Merely because goods are sold within one store under the same roof does not automatically mean that buyers are likely to be confused as to source, connection or sponsorship ... Consumers know that modern grocery stores sell a plethora of

unrelated goods, including food, toys, clothing, automotive accessories, and so on.   Thus, modern consumers would be less likely than their counterparts in previous decades to infer a connection between goods with the same mark, merely from the fact that they appear together in a grocery store." McCarthy on Trademarks and Unfair Competition, 4th Ed. Sec. 24:45.

4) **The Relationship Between the Parties' Advertising**.

MV's advertisements prominently display the Nestlé mark.  Nestlé Ricas are advertised together with other Nestlé products.  The prospective purchaser can thus clearly identify the Nestlé Ricas as a Nestlé, not a Borinquen Biscuit, product. See advertising samples attached as Exhibit F of the Complaint.  Borinquen has not produced any of its advertisements.  Borinquen's website, however, promotes GALLETAS RICA SUNLAND as "Rica Biscuits," together with the prominently displayed Galletas Royal Borinquen mark. See Exhibit 2.

(5) **The classes of prospective purchasers**.

Plaintiff again incorrectly states that "RICA" and "Ricas" crackers target the exact same class of prospective customers, cookie eaters.  Plaintiff has two misstatements in that sentence.  First, "GALLETAS RICA SUNLAND" are not crackers; they are cookies.  Second, Nestlé's Ricas do not target cookie eaters because they are crackers.  A purchaser who wants a cookie buys a cookie and a person who wants a cracker buys a cracker.

(6) **Evidence of actual confusion**.

Plaintiff has offered absolutely no evidence of actual confusion. The weak evidence of actual confusion weighs quite heavily against a finding of likelihood of confusion.  <u>Aktiebolaget Electrolux v. Armatron Int'l, Inc.</u>, 999 F.2d 1, 4 (1st Cir. 1993).  Because the listed factors must be evaluated in context, any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark.  <u>The International Association of Machinists and Aerospace Workers v. Winship Green Nursing Center</u>, 103 F.3d 196 (1st Cir. 1996).  MV has been selling Nestlé Ricas for over a year.  Yet, Borinquen has produced absolutely no evidence that actual confusion between the products has occurred.

**(7) <u>The defendant's intent in adopting its mark</u>.**

MV did not come up with or design the mark in question.  As it is clear from the Nestlé Ricas box, the mark belongs to Societé de Produits Nestlé SA and is distributed in many markets besides Puerto Rico.  Thus, there has been absolutely no intent on the part of MV in benefitting from GALLETAS RICA SUNLAND's reputation since MV had absolutely nothing to do with the adoption of the Nestlé Ricas mark.

**(8) <u>The strength of plaintiff's mark</u>.**

In determining a trademark's relative strength, the First Circuit has examined "the length of time a mark has been used and the

relative renown in its field; the strength of the mark in plaintiff's field of business; and the plaintiff's action in promoting the mark." <u>Keds Corp.</u>, 888 F.2d at 222 (quoting <u>Boston Athletic Ass'n v. Sullivan</u>, 867 F.2d 22, 32 (1st Cir. 1989)).

Borinquen correctly cites this Court's opinion in the case of <u>Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.</u>, 537 F. Supp. 587 (D.P.R. 1982) to the effect that "a strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties," citing <u>Exxon Corp. v. Texas Motor Exchange of Houston</u>, 628 F.2d 500, 504 (5 Cir., 1980). "Stronger marks are accorded broader protection against infringement than are "weak marks' ". <u>Pignons S. A. de Mecanique v. Polaroid Corp.</u>, supra, at 492.

Besides the fact that Galletas Sunland Ricas have been in the market for a number of years, plaintiff has offered absolutely no evidence of the alleged strength of the mark. While it is true that there appears to be no other registered RICA mark for the sale of cookies, plaintiff neglects to mention that numerous registered marks in both Puerto Rico and the United States use the word RICA. See Exhibit 3. The name Rica is used in the marketing of vitamin and mineral products, hamburgers, processed peppers, processed beans, dry and premixed food products, coffee, computer components, milk, cheese, dairy products, hearts of palm, fruit juices, standardized testing services, sausages, cold cuts, processed

meats, gourmet Mexican food restaurants, tobacco products, educational services, processed macadamia nuts, "tostadas," tortillas, processed capiscum peppers, clothing and sportswear, electrical resistors, tea, cocoa, sugar, rice, honey, sauces, salt, mustard, vinegar, spices, sardines, mackerel, herring, shoes, corn tortilla mix, Spanish language adult magazines, fresh bananas, canned fish, wine, tortilla chips, cassava, jeans, surgery instruments, papaya, earth, and soft drinks. Thus, Borinquen's mark has been diluted by all the different registration to the point of becoming a very weak mark. Nestlé, on the other hand, is a world-renowned mark, that customers readily identify. J & J Snack Foods, Corp v. Nestle USA, Inc., 149 F. Supp. 2d 136 (D.N.J. 2001).

Consequently, after examining the eight factors to consider the likelihood of confusion, it is clear that no such likelihood exists here.

**RICA is a descriptive term**

An element essential to common law unfair competition is that the features of a competitor's trade dress that plaintiff asserts are unfairly imitative have acquired a significance, so that the public associates those features with the plaintiff. Kellogg Co. v. National Biscuit Co., supra; Cooperativa Cafeteros v. Colon Colon, supra. A court's inquiry into whether a term merits trademark protection starts with the classification of that term along the

spectrum of "distinctiveness."  At one end of the spectrum there are generic terms that have passed into common usage to identify a product, such as aspirin, and can never be protected. In the middle there are descriptive terms, which can be protected, but only if it has acquired a "secondary meaning" by which consumers associate it with a particular product or source. At the other end of the spectrum, there are suggestive, arbitrary and fanciful terms that can be protected without proof of secondary meaning. These terms are considered "inherently distinctive." <u>Boston Beer Co. v. Slesar Bros. Brewing Co.</u>, 9 F.3d 175, 180 (1st Cir. 1993).

In <u>Telerep Caribe, Inc. v. Zambrano</u>, 146 F. Supp. 134 (D.P.R. 2001), this court stated that a "mark is 'descriptive' if it is descriptive of: the intended purpose, function or use of the goods; of the size of the goods, of the class of users of the goods, of <u>a desirable characteristic of the goods</u>, or of the end effect upon the user," <u>citing</u> <u>Wiley v. American Greetings Corp.</u>, 762 F.2d at 141 n.3 (citing <u>McCarthy</u>, § 11:5, at 353 (footnotes omitted; emphasis added)).  A descriptive term can become a trademark only if it has acquired a secondary meaning, so that the consumer associates the term with a particular producer's goods.  <u>Keebler Company v. Rovira Biscuit</u>, 624 F.2d 366 (1st Cir. 1980).   In <u>Cooperativa de Cafeteros de Puerto Rico v. Colón Colón</u>, 91 D.P.R. 372 (1964), the Supreme Court of Puerto Rico held that the word "Rico" in the "Café Rico" brand was a descriptive term and, as

such, the trademark Café Rico was not registrable under the Puerto Rico Trademark Law.  The Court listed a large number of terms that had been held to be descriptive by other courts. Id.

In <u>Kellogg Co. v. Nat. Biscuit Co.</u>, 305 U.S. 111 (1938), the Supreme Court denied an injunction to prohibit the use of the words "shredded wheat" because, <u>inter alia</u>, the use of those words had been in good faith.  Both products were sold in cardboard boxes, but the shape, size and color of the boxes were different.  The name of the producer of the goods was prominently displayed in the label.

Under the "doctrine of foreign equivalents," foreign words are translated into English and then tested for descriptiveness or genericness.  See 2 <u>McCarthy, Trademarks</u> § 11:66.  The test is whether, to those American buyers familiar with the foreign language, the word would have a descriptive connotation. Id. "Words from languages such  as ... Spanish ...  will be tested for descriptiveness by seeing whether that foreign word would be descriptive to that segment of the purchasing public which is familiar with that language." Id.  Clearly, the consumers in Puerto Rico know that the word RICA is descriptive because it describes a desirable characteristic of a product.

According to Simon and Schuster's Spanish/English dictionary, the word "Rica" means "tasty" or "delicious."  Several courts have found that the word "tasty" is descriptive. See <u>Henri's Food</u>

Products, Inc. v. Tasty Snacks, Inc., 817 F.2d 1303, 1305-06 (7th Cir. 1987)(word "tasty" is descriptive of a characteristic of many types of salad dressings).  As the lower court in the Henri case stated: "It would certainly be a sad day (and a more bland one) if a food or beverage company could corner the market on words such as "tasty," "savory," "flavorful," or "delicious.""  Henri's Food Products, Inc. v. Tasty Snacks, Inc., 642 F. Supp. 255, 259 (E.D. Wis. 1986).  Another court has stated the following:

> A term is considered to be merely descriptive of a product if it immediately conveys to purchasers information as to the ingredients, quality, characteristics, functions or other features of the product in connection with which the product is issued. Clearly the term "*tasty*" would be *merely descriptive* of sausage under this test . . . .
>
> . . . .
>
> . . . The English term "tasty" . . . describes a desirable characteristic of applicant's dry sausage.

In re Geo. A. Hormel & Co., 227 USPQ (BNA) 813, 813-14 (TTAB 1985)(citation omitted); See also Sir Speedy, Inc. v. Speedy Printing Centers, Inc., 746 F.2d 1479 (6th Cir. 1984)("Sudsy" ammonia, "Best" paper, and "Tasty" bread are descriptive terms); In In re Geo. A. Hormel & Co., 227 U.S.P.Q. 813 (T.T.A.B. 1985), it was held that the term "SAPORITO" was descriptive because it was the equivalent of "tasty" in Italian.

"Rica" can also be translated as "Rich".  The term "Rich" has also been held to be descriptive. Philip Morris, Inc. v. Brown & Williamson Tobacco Corp., 230 U.S.P.Q. 172 (T.T.A.B. 1986)(term is

a composite of the descriptive "rich" (high quality taste) and "light" (generic for low tar) and conveys the message that the cigarette is low in tar but has the taste of high tar product; no secondary meaning found). Similarly, in In re Keebler Co., 479 F.2d 1405 (C.C.P.A. 1973), the court found that the term "RICH 'N CHIPS," as used for chocolate chip cookies, was descriptive because it described a purported quality of the cookie to the consumer. Consequently, RICA is clearly a descriptive term. Thus, in order to deserve protection, Borinquen must show that it has acquired secondary meaning.

**Borinquen has not shown that GALLETAS RICA SUNLAND have acquired any secondary meaning**

The First Circuit has stated that "proof of secondary meaning entails vigorous evidentiary requirements." Yankee Candle Company, Inc. v. Bridgewater Candle Company, 259 F.3d 25 (1st Cir. 2001), quoting Boston Beer, 9 F.3d at 181 and Perini Corp. v. Perini Constr., 915 F.2d 121, 125 (4th Cir. 1990)). The only direct evidence probative of secondary meaning is consumer surveys and testimony by individual consumers. Id. Although survey evidence is not required, "it is a valuable method of showing secondary meaning." Lund, 163 F.3d at 42. Borinquen has introduced no survey evidence here or cited any evidence that individual consumers associate the particular word "Rica" or the features at issue with Borinquen. Secondary meaning occurs when 'the primary significance [of the trade dress] in the minds of the consuming public is not

the product but the producer.'" <u>Lund</u>, 163 F.3d at 42 (quoting <u>Kellogg v. Nat'l Biscuit Co.</u>, 305 U.S. 111, 118, 83 L. Ed. 73, 59 S. Ct. 109 (1938); <u>Yankee Candle Company, Inc. v. Bridgewater Candle Company</u>, 259 F.3d 25 (1st Cir. 2001). "The establishment of secondary meaning in a word is an issue of fact," <u>Wheeler</u>, 814 F.2d at 816, and the individual seeking protection for a mark bears the burden of proving that secondary meaning has attached within the relevant class of consumers. <u>Flynn v. Peters</u>, 377 F.3d 13 (1st Cir. 2004); <u>Boston Beer Co. v. Slesar Bros. Brewing Co.</u>, 9 F.3d 175, 181 (1st Cir. 1993). "There is sufficient secondary meaning as long as a significant quantity of the consuming public understand a name as referring exclusively to the appropriate party . . . ." <u>President & Trustees of Colby College v. Colby College New Hampshire</u>, 508 F.2d 804, 807 (1st Cir. 1975); see also 2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 15:8 (4th ed. 2004) (stating that to establish secondary meaning, a plaintiff needs to show "that the ordinary buyer associates the mark with a single, albeit anonymous, source").

Secondary meaning may also be proven through circumstantial evidence, specifically the length and manner of the use of the trade dress, the nature and extent of advertising and promotion of the trade dress, and the efforts made to promote a conscious connection by the public between the trade dress and the product's source. See <u>Boston Beer</u>, 9 F.3d at 182. Other factors may include

the product's "established place in the market" and proof of intentional copying. <u>Lund</u>, 163 F.3d at 42.

The plaintiff must not only show that it used a personal name as a trademark, but that a "substantial portion of the consuming public associates [the name] specifically with [its] business." Id. at 182. Furthermore, the plaintiff must show that these consumers base purchasing decisions upon seeing the trademark (i.e. the personal name) on the product:

> To acquire a secondary meaning in the minds of the buying public, a labeled product, when shown to a prospective customer, must prompt the reaction, "That is the product I want because I know that all products with that label come from a single source and have the same level of quality." In other words, the article must proclaim its identity of source and quality, and not serve simply to stimulate further enquiry about it.

2 McCarthy, supra, § 15:11.

Here, Borinquen has produced absolutely no evidence to even come close to the "vigorous" evidence required to prove secondary meaning.  Thus, it can claim no trademark protection for the descriptive term "RICA."

### FTDA CLAIM

The Federal Trademark Dilution Act (hereinafter "FTDA") grants protection to "famous" marks against any use of the mark that "causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c) (2002). The FTDA protects only the trademark owner and is not concerned with possible confusion on the part of consumers.

<u>Lund Trading v. Kohler</u>, 163 F.3d at 36. "Anti-dilution statutes have developed to fill a void left by the failure of trademark infringement law to curb the unauthorized use of marks where there is no likelihood of confusion between the original use and the infringing use." <u>L.L. Bean, Inc. v. Drake Publishers, Inc.</u>, 811 F.2d 26, 30 (1st Cir. 1987). "Under the FTDA only famous and distinctive marks are eligible for protection against dilution." <u>Lund Trading v. Kohler</u>, 163 F.3d at 36.  "The FTDA creates an exceptional anti-dilution remedy for truly famous marks. Once this greater burden of establishing fame has been met under the FTDA, the issue of dilution must be addressed.  We reject the use of the "Sweet factors" as the test for dilution and instead require an inquiry into whether target customers will perceive the products as essentially the same.  We hold that the dilution standard is a rigorous one ..." <u>Lund Trading v. Kohler</u>, 163 F.3d at 33. "One commentator has referred to this category of famous marks as 'Supermarks.'" Id. at 46, citing <u>Gibson</u> § 5.12[1][a].

The FTDA provides a non-exclusive list of eight factors that courts should consider in determining whether a mark is "distinctive and famous." *15 U.S.C. § 1125*(c)(1). The eight statutory factors are:

>     (A) the degree of inherent or acquired distinctiveness of the mark;

>     (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

While Borinquen mentions these factors, its allegations fall far short of the necessary showing that its mark is distinctive and famous. First of all, Borinquen's statement that the mark RICA has not been used by any third party is false and misleading. As Exhibit 3 shows, the word RICA has been used to identify myriad types of different products. This is evidence that Borinquen's mark is not inherently distinctive or that it has acquired such distinctiveness. Secondly, Borinquen has not come close to showing that "GALLETAS RICA SUNLAND" is a truly famous mark. Borinquen has not produced any evidence of its publicity or advertisements. Addtionally, the geographical extent of Borinquen's sales fall far short of the requirement of being a nationally renowned mark. See Lund, 163 F.3d at 47.

Finally, in Moseley v. V Secret Catalogue, 537 U.S. 418, 422-3

(2003), the Supreme Court of the United States held that to obtain an injunction under the FTDA, the text of the law "unambiguously requires a showing of actual dilution, rather than a likelihood of dilution." See 15 U.S.C. § 1125(c)(1). Borinquen does not even come close to such a showing in this case. Thus, Borinquen's claim under the FTDA must fail.

### Borinquen's unfair competition/false designation claim

Borinquen correctly states that the criteria to analyze a claim for trademark infringement is the same as the criteria to analyze a claim for unfair competition and false designation of origin. Consequently, MV incorporates by reference its arguments in defense of Borinquen's trademark infringement claim.

### There is no risk of irreparable harm

MV has shown that Borinquen will not prevail in this case. Therefore, Borinquen has not established any presumption of irreparable harm. Additionally, MV has shown that its product does not compete with Borinquen's product. Thus, Borinquen will not be harmed in any way by the continued sale of Nestlé Ricas.

### The Balance of Equities favors MV

In its argument, Borinquen states that MV will not be harmed by "being unable to continue marketing its generic swimmer's ear medication with the offending name and trade dress." Clearly, MV distributes crackers, not swimmer's ear medication. But, in any event, the sale of Nestlé Ricas constitutes the majority of MV's

sales.  MV would be extremely harmed if it is unable to continue with such sales.  Contrary to Borinquen's statements, MV cannot change the name and packaging of Nestlé Ricas becuase it is not the owner of the mark.  Borinquen, on the other hand, will not be harmed in any way because Nestlé Ricas do not compete with GALLETAS RICA SUNLAND.

### An injunction would harm the public interest

While there is a public interest that the consumers not be confused, MV has shown that no confusion exists in this case.  In contrast, the public interest will be harmed if the choice of products available to consumers is limited because of baseless allegations of confusion.

WHEREFORE, M.V. Trading respectfully requests that Borinquen Biscuit's "Motion Requesting Preliminary Injunction" be denied.

**I HEREBY CERTIFY** that today I electronically filed the foregoing motion with the Clerk of the Court using the CMF/ECF System which will send notification of such filing to Laura Beléndez Ferrero, at **belendez@reichardescalera.com.**

At San Juan, Puerto Rico, this 12ᵗʰ day of November, 2004.

TORO, COLÓN, MULLET, RIVERA & SIFRE, P.S.C.
Attorneys for MV Trading
P.O. Box 195383, San Juan, Puerto Rico 00919-5383
mfb@tcmrslaw.com
Tel : (787)751-8999
Fax: (787) 763-7760

s/Manuel Fernández-Bared
    USDC No. 204204